IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| YVONNE M. HARRIS-NUTALL, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:15-CV-3334-D |
| VS. | § | |
| | § | |
| CAROLYN W. COLVIN, ACTING | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION

Plaintiff Yvonne Marie Harris-Nutall ("Harris-Nutall") brings this action under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g) (the "Act"), for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for disability insurance benefits ("DIB") under Title II of the Act. For the reasons that follow, the Commissioner's decision is affirmed.

I

Harris-Nutall filed an application for DIB under Title II of the Act in January 2012, alleging a disability beginning March 16, 2011, due to hypertension, diabetes, high cholesterol, depression, anxiety, anemia, post-traumatic stress disorder ("PTSD"), low back pain, hyperlipidemia, diminished hearing, polyclonal hypergammaglobulinemia, hypothyroidism, and neck and shoulder. The Commissioner denied Harris-Nutall's application initially and on reconsideration. Following a hearing, the administrative law judge ("ALJ") found that Harris-Nutall is "not disabled." The Appeals Council denied

Harris-Nutall's request for review, and the ALJ's decision became the final decision of the Commissioner.

In making her decision, the ALJ followed the five-step sequential process prescribed in 20 C.F.R. § 416.920(a).  At step one, she found that Harris-Nutall has not engaged in substantial gainful activity since March 16, 2011, her alleged onset date.  At step two, the ALJ found that Harris-Nutall has severe impairments of early diabetic neuropathy (feet), obese with a past history of morbid obesity, degenerative disc disease of the cervical spine, left sounder tendinitis/bursitis, bipolar disorder, and anxiety.  At step three, the ALJ found that Harris-Nutall's impairments failed to meet or equal a listed impairment for presumptive disability under 20 C.F.R. Part 404, Subpart P, Appendix 1.  The ALJ found that Harris-Nutall has the residual functional capacity ("RFC") to

> lift/carry 10 pounds frequently and 20 pounds occasionally, stand/walk 6 hours in an 8-hour workday, and sit 6 hours in an 8-hour workday.  The claimant's ability to push/pull would be limited to the weights given.  The claimant is unable to climb ladders, ropes, and scaffolds and more than occasionally climb ramps and stairs or crawl.  The claimant can frequently stoop, crouch, and kneel and engage in occasional contact with coworkers, supervisors, and the public.  The claimant can do detailed, but not complex tasks.

R. 17.  At step four, the ALJ found that Harris-Nutall cannot perform her past relevant work as a probation/parole officer, corrections officer, case manager, administrative assistant, and counselor.  At step five, where the burden shifts to the Commissioner, the ALJ found, based on the vocational expert's ("VE's") testimony, that Harris-Nutall is capable of performing other jobs existing in significant numbers in the national economy, such as electrical

accessories assembler, small products assembler, and marker II.  Accordingly, the ALJ concluded that Harris-Nutall had not been under a disability at any time between May 16, 2011 (alleged onset date) and April 17, 2015 (ALJ's decision date).

Harris-Nutall maintains on two grounds that the Commissioner's decision must be reversed: first, the ALJ erred in failing to find Harris-Nutall's impairments meet or equal listing 1.04A in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing 1.04A"); and, second, the ALJ's RFC finding is not supported by substantial evidence.

## II

The court's review of the Commissioner's decision is limited to determining whether substantial evidence supports the decision and whether the Commissioner applied the proper legal standards to evaluate the evidence.  *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995) (per curiam).  "The Commissioner's decision is granted great deference and will not be disturbed unless the reviewing court cannot find substantial evidence in the record to support the Commissioner's decision or finds that the Commissioner made an error of law."  *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (footnotes omitted).

"The court may not reweigh the evidence or try the issues de novo or substitute its judgment for that of the [Commissioner]."  *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984) (citations omitted).  "If the Commissioner's findings are supported by substantial evidence, then the findings are conclusive and the Commissioner's decision must be affirmed."  *Martinez*, 64 F.3d at 173.  "Substantial evidence is 'such relevant evidence as a

- 3 -

reasonable mind might accept as adequate to support a conclusion.'" *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "It is more than a mere scintilla, and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993) (citing *Moore v. Sullivan*, 919 F.2d 901, 904 (5th Cir. 1990) (per curiam)). "To make a finding of 'no substantial evidence,' [the court] must conclude that there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir. 1983) (citation omitted). Even if the court should determine that the evidence preponderates in the claimant's favor, the court must still affirm the Commissioner's findings if there is substantial evidence to support these findings. *See Carry v. Heckler*, 750 F.2d 479, 482 (5th Cir. 1985). The resolution of conflicting evidence is for the Commissioner rather than for the court. *See Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983) (per curiam).

For purposes of social security determinations, "disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In determining whether an applicant is disabled, the Commissioner follows a five-step sequential analysis. *See, e.g., Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). If the Commissioner finds that the claimant is disabled or is not disabled at any step in the analysis, the analysis is terminated. *Id.* Under the five-step sequential inquiry the Commissioner considers whether (1) the claimant is presently engaged in substantial gainful

activity, (2) the claimant's impairment is severe, (3) the claimant's impairment meets or equals an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, (4) the impairment prevents the claimant from doing past relevant work, and (5) the claimant cannot presently perform relevant work that exists in significant numbers in the national economy. *See, e.g., Leggett*, 67 F.3d at 563 n.2; *Martinez*, 64 F.3d at 173-74; 20 C.F.R. § 404.1520(a)(4). "The burden of proof is on the claimant for the first four steps, but shifts to the [Commissioner] at step five." *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994) (per curiam) (citing *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989) (per curiam)). At step five, once the Commissioner demonstrates that other jobs are available to a claimant, the burden of proof shifts to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (per curiam).

When determining the propriety of a decision of "not disabled," this court's function is to ascertain whether the record considered as a whole contains substantial evidence that supports the final decision of the Commissioner, as trier of fact. The court weighs four elements of proof to decide if there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) age, education, and work history. *Martinez*, 64 F.3d at 174 (citing *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (per curiam)). "The ALJ has a duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits." *Ripley*, 67 F.3d at 557. "If the ALJ does not satisfy [this] duty, [the] decision is not substantially justified." *Id.* Reversal of the Commissioner's decision

is appropriate, however, "only if the applicant shows that [she] was prejudiced." *Id.* The court will not overturn a procedurally imperfect administrative ruling unless the substantive rights of a party have been prejudiced. *See Smith v. Chater*, 962 F. Supp. 980, 984 (N.D. Tex. 1997) (Fitzwater, J.).

III

Harris-Nutall maintains that the ALJ erred in failing to find at step three that her impairments meet or equal Listing 1.04A.

A

1

Listing 1.04 describes "disorders of the spine," such as "herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture." Listing 1.04. "To meet Listing 1.04, a claimant must first establish a severe diagnosed spinal disorder 'resulting in compromise of a nerve root (including the cauda equina) or the spinal cord.'" *Warren v. Colvin*, 2014 WL 7059489, at *4 (N.D. Tex. Dec. 15, 2014) (Horan, J.) (quoting Listing 1.04). "In addition to the diagnostic component, a claimant must satisfy one of Listing 1.04's three subparts, 1.04A, 1 .04B, or 1.04C—that is, the severity component." *Id.* "Each subpart describes different criteria that, if satisfied, prove the claimant's diagnosed spinal disorder is also severe enough to satisfy the Listing." *Id.* To meet the criteria of Listing 1.04A,

the record must contain sufficient evidence of (a) "nerve root compression characterized by neuro-anatomic distribution of pain," (b) "limitation of motion of the spine," (c) "motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss," and (d), "if there is involvement of the lower back, positive straight-leg raising test."

*Id.* (quoting Listing 1.04A); *see also Woods v. Colvin*, 2015 WL 5311142, at *12 (N.D. Tex. Aug. 26, 2015) (Ramirez, J.), *rec. adopted*, 2015 WL 5319926 (N.D. Tex. Sept. 10, 2015) (Boyle, J.). Additionally, the claimant "must demonstrate the required loss of function for a musculoskeletal impairment, which requires her to demonstrate 'either an inability to ambulate effectively on a sustained basis . . . , or the inability to perform fine and gross movements effectively on a sustained basis.'" *Woods*, 2015 WL 5311142, at *12 (quoting *Audler v. Astrue*, 501 F.3d 446, 449 (5th Cir. 2007)).

In *Audler* the Fifth Circuit held that the ALJ's "bare conclusion" that the claimant's impairments were severe, but not severe enough to meet or medically equal one of the listed impairments, was error because "[t]he ALJ did not identify the listed impairment for which [the claimant's] symptoms fail[ed] to qualify, nor did she provide any explanation as to how she reached the conclusion that [the claimant's] symptoms [were] insufficiently severe to meet any listed impairment." *Audler*, 501 F.3d at 448. The court explained that, "[b]y the explicit terms of the statute, the ALJ was required to discuss the evidence offered in support of [the claimant's] claim for disability and to explain why she found [the claimant] not to be disabled at that step." *Id.* (citing 42 U.S.C. § 405(b)(1)). Noting that an ALJ is not "always required to do an exhaustive point-by-point discussion," the court stated that it simply could

not "'tell whether her decision [was] based on substantial evidence'" because she "offered nothing to support her conclusion at this step." *Id.* (quoting *Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir. 1986)).

2

Harris-Nutall maintains that the ALJ failed to support her step three finding with a discussion of the relevant evidence in the record, as *Audler* requires. The Commissioner responds that *Audler* is factually distinguishable because the ALJ in this case specifically stated that she analyzed Harris-Nutall's impairments under the required criteria of Listing 1.04A. The Commissioner also points out that the ALJ was not required to articulate all the evidence she accepted and rejected.

The court agrees with the Commissioner that the ALJ here did more than the ALJ in *Audler* because she specifically identified Listing 1.04. She found that "[t]here is no evidence the claimant has experienced the degree of physical pain and functional limitation required to meet or equal the criteria of Medical Listing 1.04, disorders of the back, or any other Medical Listing(s)." R. 16. But the ALJ erred by failing to discuss the medical evidence or provide the reasons for this determination. *See, e.g., Woods*, 2015 WL 5311142, at *12 (holding that ALJ committed legal error, even though she identified Listing 1.04, when "she failed to discuss any of the [claimant's] medical evidence and explain how the evidence did not meet the severity criteria of Listing 1.04"). The court's inquiry, however, does not end here. Instead, the court "must still determine whether this error was harmless." *Audler*, 501 F.3d at 448.

B

1

"In considering whether a step three error was harmless in *Audler*, the Fifth Circuit reviewed the evidence to determine whether the claimant had demonstrated that she satisfied all the criteria of the Listing at issue." *Pannell v. Astrue*, 2012 WL 4341813, at *3 (N.D. Tex. Sept. 21, 2012) (Fitzwater, C.J.) (citing *Audler*, 501 F.3d at 448-49). The record included findings from the claimant's treating physician that satisfied the Listing, and "[n]o medical evidence was introduced to contradict these findings." *Audler*, 501 F.3d at 449. The *Audler* panel concluded that, absent some explanation from the ALJ, the claimant "met her burden of demonstrating that she meets the Listing," and "her substantial rights were affected by the ALJ's failure to set out the bases for her decision at step three." *Id.*

Under *Audler*, "[f]or a claimant to show that h[er] impairment matches a listing, it must meet *all* of the specified medical criteria." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original); *see also Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991) (per curiam) ("[T]o secure a finding of disability without consideration of age, education, and work experience, a claimant must establish that his impairment meets or equals an impairment enumerated in the listing of impairments in the appendix to the regulations."). The criteria in the listings are "demanding and stringent." *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994).

2

Harris-Nutall posits that the evidence in the record indicates that her cervical spine

impairment meets or equals all the criteria of Listing 1.04A. She contends that the ALJ concluded at step two that she has the severe impairment of degenerative disc disease of the cervical spine. And she asserts that "[t]he record establishes that [her] cervical spine impairment is accompanied by 'evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, [and] motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss.'" P. Br. 5 (quoting Listing 1.04A). In support of these allegations, however, Harris-Nutall merely cites over 750 pages in the record. Additionally, Harris-Nutall alleges that "[t]he Veteran Administration's [("VA's")] records reflect that [she] had thecal sac indentation that likely contacted the nerve root, which resulted in radiating pain to [her] left upper extremity, impaired sensory perception to light touch, and weakness." *Id.* But she again merely cites the same 750 pages in the record. Finally, citing to 42 pages in the record, Harris-Nutall asserts that "[her] range of motion has also been severely limited." *Id.* Harris-Nutall's citing generally to hundreds of pages in the record—without attempting to point to specific evidence within these pages that establishes that each individual criteria of Listing 1.04A has been satisfied—is insufficient to meet her burden of showing that her impairment meets or equals Listing 1.04A.

Furthermore, this case is unlike *Audler* because the Commissioner points to contrary evidence in the record showing that Harris-Nutall's impairments do not meet Listing 1.04A. *See Pannell*, 2012 WL 4341813, at *5 (distinguishing *Audler* because, although some of the medical records contained evidence that claimant's impairments met Listing 1.04A, there

was also contrary evidence).  For instance, the findings from a magnetic resonance imaging

("MRI") test in January 2012 of Harris-Nutall's cervical spine showed her "cervical cord

[was] not compressed," R. 538, and the findings from another MRI taken in December 2014

do not mention nerve root compression.   The court therefore concludes that there is

substantial evidence to support the ALJ's finding that Harris-Nutall's impairments did not

meet the requirements for Listing 1.04A.  Accordingly, the ALJ's error in failing to state

reasons for the adverse determination at step three is harmless and does not require reversal.

*See Audler*, 501 F.3d at 448-49; *Pannell*, 2012 WL 4341813, at *5.

## IV

Harris-Nutall contends that the ALJ failed to include all limitations relating to her

impairments when formulating her RFC.  Her argument appears to be two-fold.  First, the

ALJ ignored evidence in the record showing that Harris-Nutall's physical and mental

impairments cause greater limitations than her RFC reflects.  Second, the ALJ failed to

properly evaluate the opinions of treating physicians, Gertha Shivakumar, M.D. ("Dr.

Shivakumar") and Pramod Pinnamaneni, M.D. ("Dr. Pinnamaneni").

## A

Harris-Nutall accuses the ALJ of impermissibly picking and choosing only the record

evidence that supports her RFC finding, and she avers that the ALJ ignored record

evidence—specifically, her Global Assessment of Functioning ("GAF") scores and her VA

disability rating—that show her physical and mental impairments cause greater limitations

than the RFC reflects.

1

Harris-Nutall maintains that her GAF scores (between 45 to 60) reflect moderate to serious symptoms that impair her functioning, and that her consistently low GAF scores indicate a much higher degree of limitation than indicated in the RFC.  The Commissioner responds that the ALJ thoroughly considered all the evidence in the record and that the ALJ's RFC finding is supported by substantial evidence.  The Commissioner also maintains that the GAF scale is intended for use by practitioners in making treatment decisions, but GAF scores have a limited significance in a disability controversy because they do not necessarily relate to whether a claimant is disabled under the Act and may indicate problems that do not necessarily relate to an ability to hold a job.  And the Commissioner notes that she has declined to endorse the use of the GAF scale, considering that the scale has no direct correlation to the severity requirements in the mental disorder listings.

The court holds that the ALJ properly considered Harris-Nutall's GAF scores, along with the other evidence in the record, in reaching her RFC determination.  "Under the regulations and our case law, the determination of [RFC] is the sole responsibility of the ALJ."  *Taylor v. Astrue*, 706 F.3d 600, 602-03 (5th Cir. 2012) (per curiam) (citing *Ripley*, 67 F.3d at 557).  The ALJ "is responsible for assessing the medical evidence and determining the claimant's [RFC]."  *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985).  The ALJ's RFC "assessment is not a medical opinion."  *Joseph-Jack v. Barnhart*, 80 Fed. Appx. 317, 318 (5th Cir. 2003) (per curiam) (citing 20 C.F.R. §§ 416.946, 416.927(e)).

"[F]ederal courts have declined to find such a strong correlation between an

individual's GAF score and the ability or inability to work." *Jackson v. Colvin*, 2015 WL 7681262, at *3 (N.D. Tex. Nov. 5, 2015) (Cureton, J.) (citing 65 Fed. Reg. 50,746, 50,764-65 (Aug. 21, 2000) (declining to endorse the GAF scale for use in Social Security and SSI disability programs, and stating that the GAF scale "does not have a direct correlation to the severity requirements in our mental disorders listings")), *rec. adopted*, 2015 WL 7582339 (N.D. Tex. Nov. 25, 2015) (McBryde, J.). "'Rather a GAF score measures an individual's "overall level of functioning' and is used for 'planning treatment and measuring its impact, and in predicting outcome.'" *Id.* (quoting *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed., rev. 2000) ("DSM–IV–TR")). Notably, "in the updated version of the DSM, the American Psychiatric Association no longer recommends the use of the GAF scale as a diagnostic tool for assessing a patient's functioning due to 'its conceptual lack of clarity . . . and questionable psychometrics in routine practice.'" *Spencer v. Colvin*, 2016 WL 1259570, at *6 n.8 (W.D. Tex. Mar. 28, 2016) (quoting *American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013) ("DSM–V")); *see also Jackson*, 2015 WL 7681262, at *3. Moreover, "[t]he SSA published internal instructions regarding how to continue interpreting GAF scores that appear in medical records, noting that such scores should be treated as opinion evidence." *Jackson*, 2015 WL 7681262, at *3 (citing SSA Administrative Message 13066 (effective July 22, 2013) ("AM–13066")). The SSA further instructed that, "'[a]s with other opinion evidence, the extent to which an adjudicator can rely on the GAF rating as a measure of impairment severity and mental functioning depends on whether the GAF rating

is consistent with other evidence, how familiar the rater is with the claimant, and the rater's expertise.'" *Id.* (quoting AM–13066).

Harris-Nutall received multiple GAF scores, ranging from 45 to 60.[1]  A GAF score of 51 to 60 indicates a "moderate" impairment in social, occupational, or school functioning, and a GAF score of 41 to 50 indicates a "serious" impairment in social, occupational, or school functioning. *See* DSM–IV–TR at 34.  Regarding Harris-Nutall's GAF scores, the ALJ explained:

> The evidence shows during 2011 the claimant was assessed with a [GAF] as high as 65, which is consistent with only mild limitations in social, occupational, and psychological functioning.   Although symptom exacerbations were intermittently reported, symptoms that included mood liability and poor sleep, . . . with the exception of Christopher G. Bellah, Ph.D. [("Dr. Bellah")], who assessed the claimant with a GAF of 45 following an October 2, 2012 consultative psychological evaluation, progress notes show through December 2012 the claimant was assessed with GAF's ranging from 50 to 60.
>
> The evidence also indicates that Dr. Bellah's assessment was based primarily on the claimant's subjective reports, as objective findings on mental status evaluation revealed logical, goal-directed thought processes, an unremarkable mood, a normal affect, intact memory, and an ability to successfully complete a three-step command.  Dr. Bellah's findings do not support a

---

[1]In her opinion, the ALJ stated that Harris-Nutall "was assessed with a [GAF] as high as 65," R. 21, but the parties agree that Harris Nutall's GAF scores range from 45 to 60. Harris-Nutall, however, does not raise this specific issue in her brief. Moreover, this reference to a GAF score of 65 appears to be a typo on the part of the ALJ, considering that she also stated that, "with the exception of Christopher G. Bellah, Ph.D., who assessed the claimant with a GAF of 45 following an October 2, 2012 consultative psychological evaluation, progress notes show through December 2012 the claimant was assessed with [GAFs] ranging from 50 to 60." *Id.*

> GAF of 45, nor do treatment records that show when examined
> during 2013 the claimant presented euthymic and denied
> ongoing problems with mood, energy, or focus despite
> persisting problems with initial insomnia and increased daily
> alcohol use since the death of her grandmother establish serious
> limitations in function that would preclude competitive work[.]

R. 20-21 (internal citations omitted).

This discussion shows that the ALJ sufficiently considered Harris-Nutall's GAF scores and permissibly found that the low GAF score, as assessed by Dr. Bellah, was entitled to little weight because it was based primarily on Harris-Nutall's subjective reports and conflicted with Dr. Bellah's objective findings, as well as other record evidence. *See Jackson*, 2015 WL 7681262, at *3 ("It is within the ALJ's province to resolve conflicts when an assigned GAF score by a treating source conflicts with the treating source's own descriptions of the patient's mental symptoms and/or function." (citation omitted)); *see, e.g., id.* *3-4 (holding that ALJ properly evaluated claimant's GAF scores, ranging from 40 to 44, "as he reported them throughout his decision" and found such scores were inconsistent with the actual treatment records—that is, although treating physician's GAF scores reflected very little improvement, treating physician's actual treatment records showed positive improvements with her symptoms); *Walker v. Colvin*, 2015 WL 5836263, at *13 (N.D. Tex. Sept. 30, 2015) (Ramirez, J.) (holding that ALJ did not fail to consider the importance of GAF score because ALJ stated that consultative examiner gave claimant a GAF score of 60, but that "[consultive examiner] also found that [claimant] made exaggerated statements and that some of her statements at the hearing conflicted with those she made to [consultive

examiner]"); *Hawkins v. Astrue*, 2011 WL 1107205, at *6 (N.D. Tex. Mar. 25, 2011)

(Kaplan, J.) (explaining that "ALJ was not required to accept [consultive medical

examiner's] assessment of plaintiff's GAF score [of 49] or explain the weight given to her

opinions" and holding that ALJ's explanation—"that plaintiff's low GAF score was

inconsistent with [consultive medical examiner's] other findings"—satisfied ALJ's duty

under the regulations); *Spann v. Astrue*, 2010 WL 815630, at *5 (N.D. Tex. Mar. 10, 2010)

(Koenig, J.) (holding that ALJ did not err by assigning no weight to claimant's GAF score

because ALJ found that the score, which was assessed by psychiatrist, was not supported by

psychiatrist's treatment notes or the record), *rec. adopted*, 2010 WL 815630 (Cummings, J.).

Accordingly, the ALJ's explicit discussion of Harris-Nutall's GAF scores satisfied her duty

under the regulations.

2

Harris-Nutall also maintains that the ALJ erred by disregarding her VA disability

rating, which she avers supports more severe limitations than the RFC reflects. The

Commissioner responds that a determination by the VA that a claimant is disabled is not

binding on the Commissioner because the criteria applied by the two agencies are different.

And the Commissioner maintains that the record evidence supports the ALJ's decision not

to rely on Harris-Nutall's VA disability rating.

The court holds that the ALJ did not err by failing to assign great weight to Harris-

Nutall's VA disability rating. In *Chambliss v. Massanari*, 269 F.3d 520 (5th Cir. 2001) (per

curiam), the Fifth Circuit explained that "[a] VA rating of total and permanent disability is

not legally binding on the Commissioner because the criteria applied by the two agencies [are] different, but it is evidence that is entitled to a certain amount of weight and must be considered by the ALJ." *Id.* at 522 (citing cases).  The court also explained that, while a VA disability determination is entitled to "great weight" in most cases, "the relative weight to be given this type of evidence will vary depending upon the factual circumstances of each case," and "[s]ince the regulations for disability status differ between the SSA and the VA, ALJs need not give 'great weight' to a VA disability determination if they adequately explain the valid reasons for not doing so."  *Id.*; *see also Welch v. Barnhart*, 337 F.Supp.2d 929, 935 (S.D. Tex. 2004) ("Where the ALJ disagrees with VA's disability findings, there is no reversible error as long as the record reflects consideration of those findings." (citing *Kinash v. Callahan*, 129 F.3d 736, 739 (5th Cir. 1997))).  "Although there is no bright-line rule in the case law or regulations setting forth what level of explanation or discussion of valid reasons is necessary to be considered adequate, some level of discussion and/or scrutiny of the VA disability determination is required."  *Albo v. Colvin*, 2013 WL 5526584, *8 (N.D. Tex. Sept. 30, 2013) (Averitte, J.), *rec. adopted*, 2013 WL 5526584 (Robinson, J.).

Here, the VA assessed Harris-Nutall with a 90% service-connected disability rating with the following related disabilities and ratings: PTSD (70%), hypertensive heart disease (30%), tinnitus (10%), hypertensive vascular disease (10% ), and superficial scars (10%). The ALJ specifically mentioned the VA disability rating in her opinion.  She noted that the "physical disability impairment ratings proposed by the [VA] through July 2013 . . . included a [30%] disability due to hypertension heart disease, a [10%] disability due to tinnitus, a

[10%] disability due to hypertensive vascular disease, and a [10%] disability due to superficial scars," R. 19 (citing R. 1543), and that "the evidence shows that [Harris-Nutall] has been assessed with a [70%] disability rating due to PTSD by the VA, *id.* at 20; *cf. Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000) (holding there was reversible error when "ALJ did not mention or scrutinize [the claimant's] VA rating").

The ALJ then provided reasons for assigning the VA disability rating little weight. She stated that a VA disability rating "is not binding on the [SSA]" and concluded that Harris-Nutall's VA disability rating "[was] entitled to no weight" "given [Harris-Nutall's] daily activities, detailed above, and her medical history." R. 20; *see Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988) (per curiam) ("Here, the ALJ expressly considered the VA rating and rejected it as 'not well supported by objective evidence[.]'"); *see also Vaught v. Astrue*, 271 Fed. Appx. 452, 454-55 (5th Cir. 2008) (per curiam) (holding that ALJ took account of VA disability rating and did not assign it significant weight because "relevant VA's regulations were inconsistent with the Social Security regulations," and "ALJ went on to explain that it was giving 'greater weight' to the 'other evidence including the actual VA medical records'"). And throughout her opinion, the ALJ discussed, cited, and relied on the VA medical records. *See Smith v. Colvin*, 2015 WL 5541217, at *5 (S.D. Miss. Sept. 17, 2015) (holding that ALJ sufficiently reviewed VA disability decision and evidence relied on by the VA in reaching that decision because the "ALJ expressly refer[red] to evidence in the VA records throughout his decision"); *see also Kinash v. Callahan*, 129 F.3d 736, 739 (5th Cir. 1997) (per curiam) ("The record reflects that the Commissioner considered both [the VA

and another agency's] findings and the evidence underlying each.  The Commissioner chose to disagree with those findings. This alone is not reversible error.").  Thus it is clear from the ALJ's opinion that the ALJ sufficiently considered Harris-Nutall's VA disability rating.

Moreover, Harris-Nutall offers only a bare assertion of error, arguing that the ALJ failed to assign the VA disability rating "great weight."  *See Chambliss*, 269 F.3d at 523 ("Because the ALJ considered the VA disability determination and set forth valid reasons for giving the determination diminished weight, we cannot say that the ALJ erred simply because it did not give 'great weight' to the VA disability determination.").  Harris-Nutall does not explain why the ALJ's reasons for not giving the VA disability rating greater weight were erroneous.  *See Vaught*, 271 Fed. Appx. at 455 ( "[Claimant] does not explain why the ALJ's reasons for not giving the VA disability determination greater weight were erroneous, and therefore leaves us with no basis upon which to find error."); *see also Munson v. Comm'r of the Soc. Sec. Admin.*, 2014 WL 1165837, at *11 (M.D. La. Mar. 21, 2014) (explaining that claimant asserted only that ALJ did not give adequate consideration to VA disability determination but provided no other "argument as to why the consideration was inadequate or why the ALJ's reasons were invalid," and holding that "[b]ecause the ALJ considered both the VA's rating and medical evidence and [claimant] does not offer any argument or specific allegation to support this claim, the Court cannot find error" (citing cases)).  Accordingly, the court holds that the ALJ did not err in considering Harris-Nutall's VA disability rating.

B

Harris-Nutall contends that the ALJ failed to properly evaluate the opinions of treating physicians, Drs. Shivakumar and Pinnamaneni, when determining her RFC.  Her argument appears to be two-fold.  First, Harris-Nutall asserts that the ALJ did not give sufficient weight to their opinions, and, second, she posits that the ALJ erred by not conducting a detailed analysis of the 20 C.F.R. § 404.1527(c) factors before assigning no weight to their opinions.[2]

1

Generally, controlling weight is assigned to the opinion of a treating physician if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.  *See Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *see also* 20 C.F.R. § 404.1527(c)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.").  "The ALJ may give little or no weight to a treating source's opinion, however, if good cause is shown."  *Ranes v. Astrue*, 2009 WL 2486037, at *9 (N.D. Tex. Aug. 14, 2009) (Fitzwater, C.J.) (citing *Newton*, 209 F.3d at 455-56).  "Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where

---

[2]Harris-Nutall cites 20 C.F.R. § 404.1527(*d*), but it is clear that she intends to refer to 20 C.F.R. § 404.1527(*c*).

the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Newton*, 209 F.3d at 456 (citations omitted).

As a procedural matter, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician *only* if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527[(c)]." *Id.* at 453. Under 20 C.F.R. §§ 404.1527 and 416.927, the ALJ must evaluate the following factors before giving less than controlling weight to a treating source's opinions: (1) whether there was an examining relationship; (2) the treatment relationship, including the length, nature, and extent of the treatment relationship, as well as the frequency of the examination(s); (3) the support of the source's opinion afforded by the medical evidence of record; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the source; and (6) other factors that "tend to support or contradict the opinion." 20 C.F.R. § 404.1527(c); *see also Fitzpatrick v. Colvin*, 2016 WL 1258477, at *5 (N.D. Tex. Mar. 31, 2016) (Fitzwater, J.) (discussing six-factor test).

2

Harris-Nutall contends that the ALJ did not give sufficient weight to the opinions of Drs. Shivakumar and Pinnamaneni regarding her physical and mental limitations, respectively, and that their opinions support greater limitations that the RFC reflects. She points out that Dr. Shivakumar found that she had significant mental limitations that would

result in her being absent from a job more than twice a month, precluding competitive work, and that Dr. Pinnamaneni found that she can lift less than 10 pounds occasionally, perform no overhead reaching, perform grasping, turning and twisting of object for only 10% of the workday, sit less than two hours in an eight-hour workday, and stand less than two hours in an eight-hour workday with unscheduled breaks every 15 minutes.  The Commissioner responds that other evidence of record—specifically, Harris-Nutall's activities of daily living and medical records—contradict Drs. Shivakumar and Pinnamaneni's opinions.

The court holds that the ALJ had good cause to discount the opinions of Drs. Shivakumar and Pinnamaneni, and that she gave sufficient reasons to support her decision. The ALJ found that Harris-Nutall has the RFC to

> lift/carry 10 pounds frequently and 20 pounds occasionally, stand/walk 6 hours in an 8-hour workday, and sit 6 hours in an 8-hour workday.  The claimant's ability to push/pull would be limited to the weights given.  The claimant is unable to climb ladders, ropes, and scaffolds and more than occasionally climb ramps and stairs or crawl.  The claimant can frequently stoop, crouch, and kneel and engage in occasional contact with coworkers, supervisors, and the public.  The claimant can do detailed, but not complex tasks.

R. 17.  In making this finding, the ALJ rejected the opinions of Drs. Shivakumar and Pinnamaneni.

The ALJ first summarized the opinions of Dr. Pinnamaneni contained in the Physical Impairment Questionnaire:

In [Dr. Pinnamaneni's] October 4, 2013 medical source statement, he opined the claimant could sit/stand at most one hour in an eight-hour workday.  Dr. Pinnamaneni reported that the claimant would require a break every fifteen minutes and would need to rest thirty minutes before returning to work.  He also opined the claimant could lift less than 10 pounds occasionally, grasp/turn objects with the bilateral hands only ten-percent of the workday, and perform fine manipulations with the bilateral hands only thirty percent of the workday.  Dr. Pinnamaneni reported the claimant could reach bilaterally including overhead zero-percent of the workday and would require a cane for ambulation.  He also reported that the claimant would need to avoid all environmental factors, except perfumes, and could never perform postural maneuvers other than occasionally crouching.  Dr. Pinnamaneni reported the claimant could be expected to be absent from work more than twice a month.  Dr. Pinnamaneni, who noted he examines the claimant "month to month, or as needed" based his opinion of a total and permanent 100% disability on impairments that included a sleep disorder, cervical spine degenerative disc disease at C5-6, type II diabetes mellitus, allergies, hypertensive aortic valve, anxiety, chronic pain, and disorder of the lumbar spine.

R. 18.  The ALJ stated that the record did not reflect that Dr. Pinnamaneni was a treating source between 2011 and 2012,[3] and she explained why the evidence in the record "[did] not support" the degree of functional limitation found by Dr. Pinnamaneni in the Physical Impairment Questionnaire.  For example, the ALJ noted that Harris-Nutall reported that she exercised twice daily and walked 12 miles in one day in April 2011; reported in June 2011 and November 2012 that her pain was a level zero on a ten-point scale, with ten being the most severe; and reported that she had been exercising regularly in March 2012.  The ALJ

---

[3]Harris-Nutall does not challenge that Dr. Pinnamaneni was a treating source in 2011 and 2012.

explained that medical records did not indicate that Harris-Nutall had impaired ambulation and coordination or any ambulatory deficits.  The ALJ also noted that at the time Harris-Nutall was issued a cane in July 2013, she "denied numbness or tingling in her lower extremities, as well as radicular symptoms, explaining her pain affects only her lower back and hips." *Id.* at 19-20.  The ALJ also stated that Harris-Nutall reported in April 2013 that she walked about 30 minutes daily without many problems, and, according to treatment records, she "continued to demonstrate a normal gait with no mention made of the need for an assistive device even after being provided with her cane." *Id.* at 20.  The ALJ explained that in 2013 Harris-Nutall denied problems with heat/cold intolerance or tremors; she lost weight during the time period relevant to this decision; and, as recently as December 2014, she demonstrated no dorsal or lumbar tenderness and no need for a back brace or cane. Because there was contrary record evidence, and the ALJ had adequate grounds to find that the evidence in the record "[did] not support Dr. Pinnamaneni's opinions" in the Physical Impairment Questionnaire, the ALJ was not obligated to give controlling weight to Dr. Pinnamaneni's opinions. *See, e.g., Johnson v. Colvin*, 2015 WL 3513209, at *9 (N.D. Tex. June 4, 2015) (Fitzwater, J.) (concluding that ALJ had adequate grounds to reject treating physician's opinion that plaintiff's physical impairments were so disabling as to prevent her from standing, walking, or sitting for more than one hour in an eight-hour work day where other medical evidence and plaintiff's own testimony indicated plaintiff was capable of standing, walking, or sitting for more than one hour in an eight-hour work day).

Additionally, the ALJ concluded that Dr. Shivakumar's opinions in the Mental

Impairments Questionnaire—that Harris-Nutall had "mental limitations in function that would preclude competitive work"—were "entitled to no weight" given Harris-Nutall's daily activities and medical history.  R. 20.  Regarding activities of daily living, the ALJ noted that Harris-Nutall has lived on her own with her eight-year-old son since 2011 and occasionally shops, drives, goes to movies, and attends church.  As to medical history, the ALJ stated that at a follow-up appointment one month after Harris-Nutall's alleged onset date, she reported "an improved mood," and she "had logical, goal-directed thought process and a congruent mood and affect," *id.* at 18 (citing R. 1240-41); in October 2012 Dr. Bellah concluded that Harris-Nutall had "logical, goal-directed thought processes, an unremarkable mood, normal affect, intact memory, and an ability to successfully complete a three-step command," *id.* at 21 (citing R. 737-43); at examinations in 2013, Harris-Nutall "presented euthymic and denied ongoing problems with mood, energy, or focus," *id* (citing R. 1494, 1681-82); and in 2014 Harris-Nutall described herself as doing "fine," *id.* (citing R. 1721).  Thus the ALJ found that "these facts establish moderate limitations in function that would preclude [Harris-Nutall] from engaging in more than occasional contact with coworkers, supervisors, and the public and doing more than detailed tasks."  *Id.*  Because there was contrary record evidence, and the ALJ had adequate grounds to find that Dr. Shivakumar's opinions in the Mental Impairment Questionnaire were "entitled to no weight," the ALJ was not obligated to give controlling weight to Dr. Shivakumar's opinions.  *See, e.g., Johnson*, 2015 WL 3513209, at *9.

3

Harris-Nutall maintains that the ALJ erred by assigning no weight to the opinions of Drs. Shivakumar and Pinnamaneni without first analyzing the opinions under the requirements of 20 C.F.R. § 404.1527(c).  In response, the Commissioner appears to argue that the ALJ was not required to specifically discuss the requirements of 20 C.F.R. § 404.1527(c) because she relied on first-hand medical evidence when assigning no weight to the opinions of Drs. Shivakumar and Pinnamaneni.

Assuming *arguendo* that the ALJ was required to consider these factors when analyzing the opinions of Drs. Shivakumar and Pinnamaneni, the court concludes that the ALJ properly evaluated the opinions.  "In considering whether the ALJ conducted a sufficient six-factor analysis, the court initially observes that an ALJ is not required to recite or discuss each factor in a sequential or formulaic fashion."  *Ranes*, 2009 WL 2486037, at *11 (citing *Wiltz v. Comm'r of Soc. Sec. Admin.*, 412 F.Supp.2d 601, 608 (E.D. Tex. 2005) ("[T]he adjudicator [need only] 'consider' the factors.  Neither the regulation nor interpretive case law requires that an ALJ specifically name, enumerate, and discuss each factor in outline or other rigid, mechanical form.")).  Evaluating the entirety of the ALJ's analysis, and focusing on its substance rather than its form, the court concludes that the ALJ engaged in a sufficiently detailed analysis that encompassed the six factors, and that the ALJ had good cause to discount the opinions of Drs. Shivakumar and Pinnamaneni.

It is clear that the ALJ was aware of her obligations when analyzing the opinions of treating physicians because she stated that she "considered opinion evidence in accordance

with the requirements of 20 CFR 404.1527." R. 17.  As to factors one and two—under which the ALJ evaluates the examining and treatment relationship between the claimant and the physician—the ALJ acknowledged that Dr. Pinnamaneni was a treating source who examined Harris-Nutall on a "month to month, or as needed" basis in 2013, but the record "[did] not indicate that Dr. Pinnamaneni was a treating source between 2011 and 2012." *Id.* at 18-19.  The ALJ also acknowledged that Dr. Shivakumar was a treating source who "had an opportunity to examine [Harris-Nutall] on several more occasions than Dr. Pinnamaneni," and she cited specific instances when Dr. Shivakumar examined Harris-Nutall in 2013.  *Id.* at 20.

As to factors three, four, and six—under which the ALJ evaluates the supportability and consistency of the physician's opinion as well as any other factors that "tend to support or contradict the opinion"—the ALJ explained that she was according Dr. Pinnamaneni's opinions in the Physical Impairment Questionnaire no weight because there was no evidence showing that Harris-Nutall demonstrated the degree of functional limitation that Dr. Pinnamaneni proposed, and objective medical evidence, as well as Harris-Nutall's subjective reports of pain, contradicted his opinions.  *Id.* at 19-20.  The ALJ also explained that she was according Dr. Shivakumar's opinions in the Mental Impairment Questionnaire no weight because Harris-Nutall's "daily activities" and "medical history" did not support her opinions. *Id.* at 20.  As to factor five, it is clear that the ALJ knew that Dr. Pinnamaneni was treating Harris-Nutall for her physical impairments, including her sleep disorder, cervical spine degenerative disc disease, type II diabetes mellitus, allergies, hypertensive aortic valve,

chronic pain, and disorder of the lumbar spine, and that Dr. Shivakumar was treating Harris-Nutall for her mental impairments, including her PTSD and anxiety.

As the court has already explained, the ALJ had good cause to reject the opinions of Drs. Shivakumar and Pinnamaneni.  The ALJ properly considered the factors listed in 20 C.F.R. §§ 404.1527(c) and 416.927(c), and factors three, four, and six provided good cause for the ALJ to discount Dr. Pinnamaneni's opinions in the Physical Impairment Questionnaire and Dr. Shivakumar's opinions in the Mental Impairment Questionnaire.

\*   \*   \*

For the reasons explained, the Commissioner's decision is

AFFIRMED.

July 19, 2016.


_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

- 28 -